J-A22023-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
SHAMIR H. HUNTER :
:
Appellant : No. 84 MDA 2021

Appeal from the Judgment of Sentence Entered June 1, 2017
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0004664-2016

BEFORE: BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED JANUARY 12, 2022**

Appellant, Shamir H. Hunter, appeals from the judgment of sentence

entered on June 1, 2017, as made final by the denial of Appellant's

post-sentence motion on December 23, 2020. We affirm.

The trial court thoroughly summarized the underlying facts of this case:

At a jury trial [Appellant] was found guilty of murder in the
second degree and robbery,[1] as a result of an incident that
occurred on June 19, 2016. The following are the facts
established at a jury trial held on April 24-26, 2017.

At trial, Morgan Sheaffer[] was the first to testify. On
Saturday June 18, 2016, she attended the wedding of her
cousin Brian Esworthy and his now wife Becky Esworthy.
Stephen Esworthy [("the victim")], also attended the
wedding. The victim was the groom's brother and also was
the best man in the wedding. The wedding ended at
approximately 9:30 p.m. After the reception ended, a group

---

[1] 18 Pa.C.S.A. §§ 2502(b) and 3701(a)(1)(i), respectively.

of individuals comprised of Morgan Sheaffer and her fiancé, Brian and Becky Esworthy, and [the victim] went downtown to Tom Sawyer's bar on Second Street in Harrisburg. Brian and Becky Esworthy left around midnight to go to their hotel room. Between 12:30 and 1:00 a.m. is when the rest of the group decided they would leave. The victim was going to be staying at his brother's house on Reily Street that night. [The victim] left approximately five [] to ten [] minutes before Ms. Sheaffer and her fiancé left in an Uber.

Lamar Porter, an eyewitness, testified that he was arriving at his house on 1201 Green Street at around 1:00 a.m. on June 19, 2016. Upon arriving home he decided to walk his dog because he [had not] taken him out that day. Mr. Porter brought his bike outside[] and then went to grab his dog. When doing that, Mr. Porter saw the victim walking up Green Street visibly intoxicated. A few minutes after that, Mr. Porter also notice[d Appellant] walking up Green Street as well. He noted in his testimony that[ Appellant] was wearing his shirt around his neck and was walking with a stick[2] in his hand. At that point, Mr. Porter [got] on his bike to walk his dog and pedal[ed] down Cumberland Street towards Second Street and crosse[d] in front of [Appellant]. After two [] to three [] minutes, Mr. Porter [came] back from walking his dog, he [began] to make a right turn on the comer of Verbeke Street onto Green Street, but [saw Appellant] standing over the victim, going through his pockets. Instead of turning down Green Street, Mr. Porter [stopped] to help the victim and [saw Appellant] run down Charles Street. When the victim [did not] respond to Mr. [Porter's] attempts to speak to him, [Mr. Porter called] 911[. This occurred at approximately] 1:29 a.m. Mr. Porter described the victim as lying face down on the ground with pieces of the broken stick lying around the victim. When police arrive[d] at the scene, Mr. Porter provide[d the] police with a description of the person he saw that night. Mr. Porter's description provided that the individual was approximately 6 feet tall, a dark-skinned complexion, thin, and wearing his shirt around

---

[2] In describing the object carried by Appellant and used to attack the victim on the night of the incident, the trial court refers, alternately, to the terms "stick" and "stake." We have incorporated a verbatim quote of the trial court's recitation of the facts.

his neck. Several days after the incident, the police indicated to Mr. Porter that they had identified a potential suspect and wanted him to look at a photo lineup. Mr. Porter identified the person he had seen on the night of the murder by placing a circle around [Appellant's] picture.

When officers arrived at the scene, Emergency Services were called to treat the victim[]. After paramedics stabilized the victim, he was placed into an ambulance so he could be transported to a hospital. As paramedics were working on the victim, he passe[d] away in the back of the ambulance at 1:47 a.m. After the victim's passing, Officers Hill and Fruhwirth secured the crime scene.

Corporal McNaughton, a forensic investigator, processed the crime scene at approximately 2:30 a.m. A search of the area surrounding the scene was conducted. Debris was found clumped together by a storm drain which police believed to be odd. Inside of the storm drain police found credit cards with the name of Mahmoud Aeilbjl. Later, a daylight search of the area was also conducted. A leather cardholder and a metal clip that belonged with the leather money holder was found, and later linked to [the victim]. At that point in time, the victim's license or other identification cards were not found on his person. The victim's license had later been recovered by Jeffrey Bedmen, a person who lived in the general area. . . .

Detective Kennedy also assisted in canvasing the area. In his attempt to find evidence that would show the suspect's flight path, he was able to obtain footage from Al's Bar and Midtown Scholar [B]ookstore. In both surveillance videos, they were able to see an individual with a description matching the one provided by the eyewitness, Mr. Porter. The video[] surveillance from Midtown Scholar Bookstore showed an individual checking door handles on various vehicles. The video show[ed] the same individual entering Mahmoud Aeilbjl's vehicle, which happens to be the same individual whose credit cards were found in a storm drain near the scene. The video surveillance from Al's Bar also showed the same individual walking through a parking lot with a shirt wrapped around his neck. Eventually, the video footage obtained from Al's Bar was released to the media, and an anonymous caller provided the name of Shamir

Hunter, which [led] police to investigate [] Appellant. After obtaining [Appellant's] name, police searched [] his Facebook account. Police [were] able to find a post on [Appellant's] page dated June 19, 2016 at 3:14 a.m. where he stat[ed] that he had just ''caught a stain'', which is commonly known [] street slang for [a] robbery. As a result of the surveillance video[] showing [Appellant] entering vehicles, a warrant [was] issued for that crime and [Appellant] was arrested the following day.

Following his arrest, [Appellant was] brought in for an interview by Detective Ferrari and Kennedy on June 25, 2016. At approximately 2:10 p.m., Detective Kennedy [read Appellant his *Miranda*[3] warnings], explaining to him that he [could] stop questioning at any time. Even after [*Miranda* warnings] were given[, Appellant] still indicated that he wanted to speak with detectives. At the outset of the interview, [Appellant] denied any involvement with the car break-ins. After [Appellant's] denial of his involvement[, the d]etectives explain[ed] to him that they h[ad] video footage of the car break-ins. Detective Kennedy also explained that someone had been attacked and robbed in the same area, and eventually passed away from his injuries. Not soon after this, [Appellant] began to change his statement. Eventually, he admit[ted] running into the victim and [declared] that they began to yell at each other, and in response to the victim trying to hit him, he picked up a stick and hit him with it. [Appellant] change[d] his story multiple times before detectives [were] able to obtain an accurate statement from him. After detectives explain[ed] to [Appellant] that all they wanted from him was to tell the truth, he beg[an] to explain his involvement. [Appellant told] detectives that he was breaking into cars on that evening trying to get money for synthetic marijuana, and when he saw [the victim,] he saw an opportunity to rob him. Eventually, [Appellant] explain[ed] that he had seen [the victim], and he appeared to be intoxicated. When he [saw the victim] leaned up against a fence, he came up behind him and hit him with the stake. The detectives then recorded the remainder of their conversation with [Appellant].

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 4 -

Dr. Wayne Ross, a forensic pathologist, conducted the autopsy of [the victim]. Dr. Ross's observations about [the victim] indicated that he had suffered an abrasion to the back of his head that extended all along the right side of his head. Additionally, there were abrasions to [the victim's] face where it appeared that he had fallen face first. [Dr. Ross] noted that there were no defensive wounds to [the victim's] hands as a reflex to falling down. Dr. Ross concluded that [the victim] had sustained an immediate neurologic injury that completely impaired his brain and rendered him unconscious.

As for the cause of these injuries to [the victim], Dr. Ross concluded that the abrasion to the back of [the victim's] head was the result of the victim being struck with the end of a stake, where the force was so great that the stick would have [] broken as a result. He also concluded that it appeared to be only one strike with an item weighing being five [] to ten [] pounds. Dr. Ross then discussed the abrasions to [the victim's] face. He noted that those injuries were consistent with a fall. Dr. Ross summarized that he believed that the injury to the back of [the victim's] head occurred before he fell to the ground, which rendered him unconscious. As a result of being rendered unconscious, [the victim] fell forward. This sequence of events also explains the lack of injuries to [the victim's] hands because there was no reflex of the victim trying to stop himself.

Sara Harner, the technician who tested various items collected from the crime scene, testified next. She testified that she had received eight [] different samples which included the following: (1) a swab from the surface of a wristwatch; (2) a cutting from the left front pocket of [the victim's] pants; (3) a cutting from the front right pocket of [the victim's] pants; (4) a cutting from the back right pocket of [the victim's] pants; (5) a cutting from the front right hip area of [the victim's] pants; (6) three swabs from a section of one of the broken pieces from the wooden stake; (7) another three swabs from a section of another broken piece from the wooden stake; and (8) a swab from the exterior surfaces of the wallet and money clip. Ms. Harner also received two [] known reference samples from [the victim] and [Appellant].

The majority of the items tested, Ms. Harner was either unable to collect a sufficient amount of DNA from the item or was able to find sufficient DNA but, it was too complex of a mixture and produced inconclusive results. However, a portion of the wooden stake, which Ms. Harner identified as item "Q6", did contain a partial DNA profile. Her testimony indicated that seven [] of the [24] locations of the DNA completely matched the known reference sample from [Appellant]. Ms. Harner explained that at the remaining [17] locations, there was simply not enough DNA to determine [] a complete match, but none of the other locations were mismatched. Ms. Harner did include in her testimony the [probability] of randomly selecting an unrelated individual to that strand of DNA as being "1 in 32 billion from the Caucasian population, 1 in 870 million from the African American population, and 1 in 10 billion from the Hispanic population".

At trial, [Appellant] testified. He indicated during his testimony that he did not feel as though he was in a sound state of mind during his interview with detectives because he had used synthetic marijuana earlier that day. Additionally, he admitted that he had used synthetic marijuana daily and had been smoking it since 2012.

Trial Court Opinion, 5/28/19, at 1-7 (citations and some capitalization omitted).

The jury found Appellant guilty of second-degree murder and robbery and, on June 1, 2017, the trial court sentenced Appellant to serve a term of life in prison. N.T. Sentencing, 6/1/17, at 13. Following the *nunc pro tunc* restoration of Appellant's post-sentence and appellate rights, the trial court denied Appellant's post-sentence motion on December 23, 2020 and Appellant filed a timely notice of appeal. Appellant raises the following claims on appeal:

Did the [trial] court err in denying Appellant's post-sentence motion requesting an arrest of [judgment] and seeking a new trial, where the verdicts of second degree homicide and

robbery were so contrary to the weight of the evidence that its shocks one's sense of justice?

> a. Specifically, did the jury give improper weight to the eyewitness testimony from Lamar Porter as the lighting conditions were poor, the perpetrator was a distance away from the eyewitness, Porter was distracted with his dog and bicycle, and Appellant was not known to the eyewitness prior to that night?

> b. Did the jury give improper weight to Appellant's testimony that he was under the influence of synthetic marijuana at the time of his interview with the police, he felt threatened, and the police coerced him into a confession by making him promises during the interrogation?

> c. Was the DNA "partial match" insufficient to establish the identity to [Appellant] as the perpetrator?

Appellant's Brief at 4 (some capitalization omitted).

Appellant claims that the jury's verdict was against the weight of the evidence. As our Supreme Court has explained:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the [factfinder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, [the Pennsylvania Supreme Court has] explained:

> > The term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 619 Pa. 423, 64 A.3d 1049, 1055 (2013) (citations, quotations, and emphasis omitted).

Appellant claims that the jury's verdict is against the weight of the evidence because: the jury gave improper weight to Lamar Porter's eyewitness testimony; the DNA results were only a "partial match;" and, Appellant was under the influence of synthetic marijuana when he was

interviewed by the police and the police coerced him into confessing. Appellant's Brief at 17-21. These claims fail. As the trial court explained, it denied Appellant's post-sentence, weight of the evidence claim for the following reasons:

> Appellant [] contends that the lighting conditions at the time of the incident were poor, which created unreliable eyewitness testimony. We disagree. . . . Eyewitness testimony of Lamar Porter was corroborated with video surveillance footage, DNA results, and an identification of [] Appellant during a photo lineup. First, it is important to note that the eyewitness described the individual he saw that evening as being approximately six [] feet tall, thin, with a dark complexion, and was wearing a t-shirt hung around his neck. Video surveillance from the Midtown Scholar Bookstore displayed an individual who met the description provided by the eyewitness. That video showed an individual wearing a white t-shirt and jeans checking the door handles on vehicles. Later in the surveillance footage, that same individual is seen walking back from Verbeke Street with a shirt wrapped around his neck[,] much like the description provided by Lamar Porter. Another surveillance video from Al's Bar was also obtained, which also showed an individual walking through the parking lot with his shirt[] wrapped around his neck. Again, this is the exact description provided by the eyewitness, Lamar Porter.
>
> Next, the Commonwealth presented the testimony of Sara Harner, who tested various items collected from the crime scene for potential DNA evidence. She testified that she was able to collect a partial DNA[] profile from item Q6, which was a portion of the wooden stake used to commit the murder. Her testimony indicated that seven [] out of [24] of the DNA locations along the strand completely matched a DNA profile from the known reference sample collected from [Appellant]. More specifically, her testimony indicated that the probability of randomly selecting an unrelated person with the same DNA profile is "1 in 32 billion from the Caucasian population, 1 in 870 million from the African American population, and 1 in 10 billion from the Hispanic population." In other words, the

probability of finding another individual that would match that DNA strand is fairly low.

Finally, [Porter] identified [Appellant] in a photo lineup. As Officer Galkowski testified, the eyewitness was relaxed and comfortable. He indicated [] Appellant[,] signed and dated the lineup of photos[,] while placing a circle around [] Appellant's photo. . . .

Regardless of [] Appellant's argument that the lighting conditions were unfavorable for making a positive identification of [] Appellant as the perpetrator of the crimes, we find that the other evidence presented was sufficient to connect [] Appellant to the murder. Additionally, "[t]he general rule is that the credibility of all witnesses is in the exclusive province of the jury. The jury is to assess the weight to be accorded each witness' testimony and may believe all, part, or none of what they hear." [**Commonwealth v. Bamosky**, 400 A.2d 168, 171 (Pa. Super. 1979)]. As such, it is up to the jury to determine what weight they will place on the testimony presented and whether they found it to be reliable or unreliable. For the aforementioned reasons, we believe that the eyewitness' testimony was reliable. . . .

In regard to [] Appellant's second argument where it was argued that the DNA results were inconclusive, we must disagree. At [] Appellant's trial[,] Sara Harner testified. She was the technician who tested various items collected from the crime scene. Most importantly, she testified that a portion of the wooden stake, the murder weapon, contained a partial DNA profile. Her testimony indicated that seven [] out of [24] of the DNA locations along the strand completely matched a DNA profile from the known reference sample collected from [Appellant]. More specifically, her testimony indicated that the probability of randomly selecting an unrelated person with the same DNA profile is "1 in 32 billion from the Caucasian population, 1 in 870 million from the African American population, and 1 in 10 billion from the Hispanic population." In other words, the probability of finding another individual that would match that DNA strand is fairly low. Although she was unable to collect a full strand of DNA, we still find that her testimony regarding the wooden stake was sufficient to prove [Appellant] was the perpetrator

- 10 -

of the crime. The extremely low probability of finding another individual with the same seven [] locations of DNA in a strand was highly convincing to the [trial] court.

Finally, we address [] Appellant's argument that his confession was coerced because he was under the influence of synthetic marijuana. . . . First, detectives who interviewed [Appellant] indicated that he was [read his *Miranda* warnings] around 2:10 p.m. As detectives explained during their testimony, when they [read *Miranda* warnings] to anyone, their goal specifically is to make sure that the individual whom they are interviewing understands the questions they ask. As part of their *Miranda* warnings, detectives explained to [Appellant] that they would stop questioning him at any time, and if at any point he wanted to stop, he [could stop]. Even after *Miranda* warnings were given, [Appellant] indicated to the detectives that he still wished to speak to them. Further, both detectives indicated to [the trial] court that there was no indication that [Appellant] was under the influence of anything at the time of the interview. Additionally, they did not get any indication that [Appellant] had any type of problem that would impact his ability to mentally participate in the interview. In addition, Detective Ferrari indicated that at no point during the interview was there any yelling; it was simply a conversation they were all having with [one] other. [Appellant] suggested during his testimony that detectives repeatedly indicated to him that they would take care of him, which he was unable to explain. Detectives made it clear to [the trial] court during their testimony that no statements had been made to [Appellant about] "protecting him" or anything else that could have been interpreted in such a manner. Lastly, we find it important to note that [] Appellant had no issue with admitting to the robbery via Facebook, where his post indicated that he had just "caught a stain". This is just one more reason why it is difficult for [the trial] court to believe that his confession was coerced. [Appellant's] nonchalance in admitting to a crime via Facebook makes it more difficult to believe that he would not have admitted to other crimes in front of two detectives.

[Appellant], in his own testimony, admitted to smoking synthetic marijuana on the morning of the [] interview. However, we find it important to note that [Appellant]

- 11 -

admitted to using synthetic marijuana daily since 2012. It is important to note that a daily user of synthetic marijuana would be expected to build up some tolerance to the effects of the drug, especially when an individual had been using said drug since 2012. Additionally, [] Appellant stated that he had used the synthetic marijuana in the morning, but he was not interviewed until the afternoon, which would provide time for the effects of the drug to wear off before beginning the interview.

Trial Court Opinion, 5/28/19, at 8-12 (citations and some capitalization omitted).

We agree with the learned trial court's analysis and conclude that the trial court did not abuse its discretion when it denied Appellant's weight of the evidence claims.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/12/2022